Filed 6/13/16  P. v. Minjares CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B265055 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. SA089429) |
| v. | |
| RICARDO MANUEL MINJARES, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Mark E. Windham, Judge.  Affirmed.

Ricardo Manuel Minjares, in pro. per.; and Richard L. Fitzer, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Scott A. Taryle and Michael Katz, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Following the denial of his suppression motion, defendant Ricardo Manuel Minjares was convicted of possessing methamphetamine for sale and sentenced pursuant to an open plea to the court. On appeal, defendant claims that the trial court erred in denying his motion because the discovery of the methamphetamine was the product of a Fourth Amendment violation (i.e., an illegal arrest). Because we conclude that the discovery occurred during a lawful *Terry*[1] stop rather than an illegal arrest, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

The People charged defendant in a single count information with possession for sale of a controlled substance (methamphetamine) (Health & Saf. Code, § 11378) and specially alleged that he had suffered two prior narcotics convictions (*id*., § 11370.2, subd. (a)) and had served seven separate prison terms (Pen. Code, § 667.5, subd. (b)). Defendant pleaded not guilty and denied the special allegations.

A.    THE SUPPRESSION HEARING

Defendant filed a motion to suppress evidence pursuant to Penal Code section 1538.5. At the suppression hearing, the People called the two officers involved in the arrest, Los Angeles Police Officers Robert Hoebink and Alex Maldonado, and defendant testified on his own behalf.

1.    *The Evidence*

The officers testified that they were on patrol in a high crime area around midnight on December 16, 2014. The area was known for its illegal drug and violent gang activity and was the subject of frequent citizen complaints. The officers noticed a black Honda parked in a liquor store parking lot. The car, which was not properly parked in a stall, partially blocked one of the driveways to the liquor store. Defendant was leaning into the driver's window, facing the driver, with his arms inside the car. Based on their observations, the officers suspected that defendant and the driver were engaged in a hand-to-hand drug transaction. The officers therefore decided to approach the Honda and

_____

[1]    *Terry v. Ohio* (1968) 392 U.S. 1, 24 [88 S.Ct. 1868, 20 L.Ed.2d 889].

2

initiate a stop. As the officers drove towards the Honda, defendant appeared to take evasive action: he looked in their direction, appeared surprised, and started to walk around the Honda and enter the passenger side of the car. As he walked, defendant furtively placed his hands inside his pockets.

When the officers approached the Honda, Officer Maldonado told defendant to exit the car out of concern for officer safety. He was concerned for several reasons, including his observation of a potential drug transaction in an area "plagued by [gangs] and narcotics sales and users," defendant's furtive hand movements that suggested he might be concealing a weapon, the fact that drug users and sellers frequently carry weapons, and the time of day. In directing defendant out of the car, Officer Maldonado told him to turn around and place his hands on top of his head, as the officer intended to handcuff defendant before conducting a pat down search. As defendant was lifting his hands above his head, Officer Maldonado saw a cardboard box labeled "Digital Pocket Scale" protruding from defendant's outer jacket pocket. Officer Maldonado removed the scale, and "[w]hen [he] removed it, there was . . . a glass pipe along with it" in the same pocket. The pipe, which contained residue, appeared to be one used to smoke methamphetamine. The officer then continued to search defendant and "felt a cylindrical crystalline . . . bag" inside the inner pocket of defendant's jacket, which he removed. The bag contained a substance resembling methamphetamine.[2] The officers then placed defendant under arrest.

On cross-examination, Officer Maldonado was asked if defendant had ever stated that he was on probation during the encounter. Officer Maldonado responded that he had asked defendant this question as he got out of the Honda, and that defendant replied he was on probation. Officer Maldonado added that he learned after the search that

---

[2]     The court held the preliminary hearing prior to the suppression motion. According to the preliminary hearing transcript, the officers also found on defendant five other bags containing almost 8 grams of methamphetamine and $577 in cash.

3

defendant's probation had previously expired. Officer Maldonado produced a computer print-out to show when he inquired about defendant's probation status.

In his testimony, defendant stated that he was not on probation in 2013, and that he had informed Officer Maldonado of that fact. He also testified that he did not raise his hands to be handcuffed; instead, Officer Maldonado had instructed him to place his hands behind his back. Defendant admitted he had smoked marijuana and methamphetamine earlier in the day of the arrest.

After the close of the evidence, defense counsel argued that the court should grant the suppression motion because Officer Maldonado was not credible when he testified that: defendant had admitted to being on probation; defendant had exposed the scale in his pocket by raising his hands; and the officer had observed defendant make furtive movements with his hands. Defense counsel also argued that the officer did not have an objectively reasonable belief that defendant was armed and dangerous, and that the use of handcuffs exceeded the scope of a *Terry* stop. (*Terry v. Ohio*, *supra*, 392 U.S. at p. 24.)

2.    *The Ruling*

The trial court denied the motion. Faced with two competing versions of the facts, the court generally credited Officer Maldonado's testimony, despite finding that his "credibility [was] imperfect," and generally disregarded defendant's testimony as not credible. The court concluded that the detention was a lawful *Terry* stop because the officer had reasonable suspicion to believe that defendant was engaged in a narcotics transaction based on the officer's observation of an apparent hand-to-hand drug transaction late at night in a high drug-trafficking area and defendant's seemingly evasive behavior upon seeing the police.[3] The court also concluded that the decision to perform a *Terry* frisk was lawful because the officer had reasonable suspicion to believe defendant

_____

[3]    Defendant does not challenge this well-supported conclusion. (See *Illinois v. Wardlow* (2000) 528 U.S. 119, 124-125 [120 S.Ct. 673, 145 L.Ed.2d 570] [reasonable suspicion to stop based on nervous and evasive conduct in high crime area]; *People v. Magee* (2011) 194 Cal.App.4th 178, 191, fn. 12 [same].)

4

was armed and dangerous under the circumstances—including furtive hand movements that suggested defendant might be trying to conceal a gun. The court rejected the defense argument that the use of handcuffs converted the *Terry* stop into an arrest, citing three cases. (*People v. Celis* (2004) 33 Cal.4th 667, 675 (*Celis*) [holding, on the facts of that case, that "stopping a suspect at gunpoint, handcuffing him, and making him sit on the ground for a short period . . . do not convert a detention into an arrest"]; *People v. Glaser* (1995) 11 Cal.4th 354, 369 [same]; *People v. Turner* (2013) 219 Cal.App.4th 151, 160 (*Turner*) [same].)[4]

Based on these conclusions, the trial court held that the officer had the constitutional authority to search defendant upon seeing the digital scale and glass pipe in defendant's pocket, as the scale and pipe were in plain view during a lawful stop and frisk. Upon searching defendant, the officer lawfully discovered the methamphetamine, according to the trial court.

## B.    THE CHANGE IN PLEA

Following the denial of the suppression motion, defendant changed his plea. After rejecting the People's offer of seven years on a straight sentence, defendant agreed to a seven-year split sentence on an open plea to the court. After an unreported sidebar conference, defendant completed an advisement of rights, waiver, and plea form. Defendant acknowledged that he had read, initialed, and signed the form and that he understood his rights, the nature of the charge, and the consequences of the plea.

Defendant pleaded no contest to possession for sale of a controlled substance and admitted all the special allegations. The trial court accepted the plea, found the defendant guilty, and sentenced him to an aggregate term of seven years (consisting of the three-year upper term on the sole charge, three years for his prior drug convictions, and one year for one prison prior). The court split the sentence pursuant to Penal Code

---

[4]    The People did not attempt to justify the search on the ground that Officer Maldonado believed that defendant was on probation and subject to search conditions. As a result, the trial court did not address the merits of this issue.

5

section 1170, subdivision (h)(5), requiring three years in custody and four years of mandatory supervision. The court imposed statutory fines, fees and assessments and awarded defendant 340 days of presentence custody credit. The court then struck the punishment for the remaining prison priors pursuant to Penal Code section 1385, subdivision (c).

C.     THE NOTICE OF APPEAL AND *WENDE* BRIEF

Defendant filed a timely notice of appeal and a request for a certificate of probable cause, challenging the denial of his motion to suppress and asserting his counsel may have provided ineffective assistance during the suppression hearing. The trial court granted defendant's request for a certificate of probable cause only as to the denial of his suppression motion. (But see *People v. Buttram* (2003) 30 Cal.4th 773, 780 [noting that a Fourth Amendment challenge may be raised on appeal without a certificate of probable cause].)

We appointed counsel to represent defendant on appeal. Counsel filed an opening brief that raised no issues and requested that we independently review the record pursuant to *People v. Wende* (1979) 25 Cal.3d 436, 441-442. On August 28, 2015, we advised defendant that he had 30 days in which to personally submit any contentions or issues he wished us to consider. On September 28, 2015, we received a six-page handwritten letter with attached exhibits, in which defendant challenges the trial court's credibility findings, arguing that the officers had "lied" in their reports and while testifying under oath. Defendant requested that we review whether the officers violated his Fourth Amendment rights when they detained and searched him.

On January 13, 2016, we sent a letter to the parties advising them that we had discovered arguable Fourth Amendment issues upon our review of the record. In that letter we briefly reviewed the salient facts at the suppression hearing and asked the parties to address whether "the trial court err[ed] in concluding that [defendant] was lawfully detained and lawfully searched." In addressing these issues, we invited "the parties . . . to consider the following case law: *Illinois v. Wardlow*[, *supra*,] 528 U.S. 119; *People v. Magee*[, *supra*,] 194 Cal.App.4th 178; *People v. Celis*[, *supra*,] 33 Cal.4th

6

667; *Rawlings v. Kentucky* (1980) 448 U.S. 98 [100 S.Ct. 2556, 65 L.Ed.2d 635]; *In re Lennies H.* (2005) 126 Cal.App.4th 1232." The parties filed briefs in response to our letter.

## DISCUSSION

In his supplemental opening brief, defendant does not dispute that the officers initially had reasonable suspicion to conduct a *Terry* stop and frisk. According to defendant, the detention became unlawful when Officer Maldonado directed him to place his hands above his head (as a prelude to handcuffing him), because the detention at that point escalated into a de facto arrest for which there was no probable cause. We disagree.

### A.    STANDARD OF REVIEW

In reviewing the denial of a motion to suppress evidence, "while we ultimately exercise our independent judgment to determine the constitutional propriety of a search or seizure, we do so within the context of historical facts determined by the trial court." (*People v. Tully* (2012) 54 Cal.4th 952, 979; *In re Antonio B.* (2008) 166 Cal.App.4th 435, 441 [applying this standard in deciding "whether the conduct of the officers in handcuffing [the defendant] transformed the valid detention into an invalid arrest"].) Here, the trial court found the officers more credible than defendant. Because that finding is supported by substantial evidence, we are bound to accept it and do so in analyzing defendant's Fourth Amendment claim. (*People v. Barnes* (2013) 216 Cal.App.4th 1508, 1519-1520 [witness credibility "is the exclusive province of the trial court hearing the suppression motion"].)

### B.    THE LAW ON THE USE OF HANDCUFFS IN A *TERRY* STOP

The question whether a detention has transformed into a de facto arrest by exceeding the scope of a *Terry* stop depends on the totality of the circumstances. (*Turner*, *supra*, 219 Cal.App.4th at p. 155.) "[T]he handcuffing of a detained individual does not necessarily convert the detention into a de facto arrest" (*People v. Osborne* (2009) 175 Cal.App.4th 1052, 1062 (*Osborne*)), but rather is a factor to be considered in the overall circumstances (*Celis*, *supra*, 33 Cal.4th at p. 676). Handcuffing is within the permissible scope of a *Terry* stop when a "'reasonably prudent' officer [citation] could

7

consider [it] necessary to protect his own safety." (*People v. Glaser*, *supra*, 11 Cal.4th at p. 369.)

The California Supreme Court applied these principles in *Celis*. In that case, an officer stopped two drug-trafficking suspects at gunpoint and handcuffed them. In rejecting the claim of a de facto arrest, the court concluded that it was reasonable to handcuff the defendant for the sake of officer safety, reasoning: "Of significance too are the facts known to the officers in determining whether their actions went beyond those necessary to effectuate the purpose of the stop, that is, to quickly dispel or confirm police suspicions of criminal activity. [Citations.] Although a routine traffic stop would rarely justify a police officer in drawing a gun or using handcuffs, such actions may be appropriate when the stop is of someone suspected of committing a felony." (*Celis*, *supra*, 33 Cal.4th at pp. 675-676; accord, *Turner*, *supra*, 219 Cal.App.4th at p. 163 [applying *Celis* and finding it reasonable to handcuff when the defendant was a felony suspect who might have had a gun].)

*Osborne* is another case that illustrates these principles. There the court found that the handcuffing during the course of a car burglary investigation was "reasonably necessary under the circumstances." (*Osborne*, *supra*, 175 Cal.App.4th at p. 1062.) The court described those circumstances as follows: "[The officer] testified that when he started to put [the] defendant's hand to the rear of his body in order to conduct the patsearch, he observed that [the] defendant was 'real nervous.' [The officer] immediately felt [the] defendant tense 'as if he were attempting to remove his hand from my grasp.' That caused [the officer] concern as [the] defendant was larger than he, and he feared that [the] defendant might be able to break free of his grasp and assault him." (*Ibid*.)

To say that handcuffing may be a permissible part of a *Terry* stop is not to say that it always will be so. On the contrary, the use of handcuffs is not the norm in an investigatory detention, and courts have not hesitated to disapprove of their use when done without proper justification. (See, e.g., *People v. Stier* (2008) 168 Cal.App.4th 21, 27-28 (*Stier*).) In *Stier*, two officers conducted a traffic stop of a car that was suspected of having been involved in a narcotics transaction. After an officer discovered narcotics

on one of the passengers, the defendant (the driver) was ordered out of the car, handcuffed, and consensually searched. The defendant moved to suppress the methamphetamine found in his pockets, contending that the detention became unlawful when he was handcuffed, thereby tainting the consent. In reviewing this contention on appeal, the court recognized that "[t]he scope of the intrusion permitted during a detention will vary with the particular facts and circumstances of each case . . . ." (*Id.* at p. 27.)

On the facts of the case, the *Stier* court concluded that handcuffing was improper. The defendant was very polite, cooperative, and docile and showed no signs of nervousness; and the officer "had no specific, articulable facts suggesting [the defendant] was armed." (*Stier*, *supra*, 168 Cal.App.4th at p. 25.) The officer handcuffed the defendant largely because he "'felt uncomfortable' about the [four to five inch] height differential" between the two men. (*Id.* at p. 28.) "While a suspect's height may be an appropriate factor for an officer to consider in assessing whether the suspect poses a present physical threat," the court concluded that it was not enough by itself. (*Ibid.*; see also *People v. Espino* (2016) ___ Cal.App.4th ___, ___ [2016 WL 2993994 at pp. 6-7] [finding that "neither physical threats nor the threat of escape justified the handcuffing of [a] defendant" who was "peaceful and compliant at all times during the stop" and outnumbered three-to-one by the police]; *In re Antonio B.*, *supra*, 166 Cal.App.4th at p. 442 [finding that the officer handcuffed the defendant based on his own general policy of handcuffing detainees and that "there [was] no evidence to suggest that the officers had any basis to believe that [the defendant] posed a danger to them"].)

Thus, the correct analysis for determining whether the use of handcuffs exceeded the scope of a *Terry* stop, thereby converting the stop into an arrest, requires an evaluation of the specific facts of the case to determine if it was justified by an objectively reasonable concern for officer safety or a suspect's flight.[5]

---

[5] In both its articulation and application of the rule for deciding when a *Terry* stop has become a de facto arrest, the court in *Stier* recognized the fact-specific nature of the

9

**C.     APPLICATION OF THE LAW TO THE FACTS OF THIS CASE**

In this case, the officer had not yet handcuffed defendant when he observed the digital scale in his pocket, but rather had initiated the handcuffing process by directing defendant to place his hands above his head.  For purposes of evaluating the level of intrusion on defendant's liberty interest under the Fourth Amendment, we will assume that this was tantamount to his being handcuffed.  (See *Florida v. Royer* (1983) 460 U.S. 491, 496 [103 S.Ct. 1319, 75 L.Ed.2d 229] [the nature of the detention depends on the scope of the invasion on a person's liberty interest].)  Even with this assumption, we find no constitutional violation here.

In concluding that handcuffing was warranted, the trial court found that the officers reasonably feared for their safety.  While rejecting as "silly" any "gang justification" for the fear (i.e., the idea that defendant might have been a gang member), the court did find that the officers had an objectively "legitimate" reason to believe defendant might have had a gun.  The court expressly found that defendant's furtive hand movements were consistent with his effort to conceal a weapon and that the officers were reasonable in taking precautions to address the existing "indicia of danger."  The trial court also found that the officers had observed an apparent drug transaction in an area known for drug trafficking; and the officers testified that drug users and sellers often carry weapons.  Moreover, it was late at night, and the officers did not outnumber the suspects.

---

inquiry.  Yet defendant suggests that *Stier* defined an exhaustive list of circumstances warranting the use of handcuffs.  In so suggesting, defendant relies on the following language in that case:  "Circumstances in which handcuffing has been determined to be reasonably necessary for the detention include when (1) the suspect is uncooperative; (2) the officer has information the suspect is currently armed; (3) the officer has information the suspect is about to commit a violent crime; (4) the detention closely follows a violent crime by a person matching the suspect's description and/or vehicle; (5) the suspect acts in a manner raising a reasonable possibility of danger or flight; or (6) the suspects outnumber the officers."  (*Stier*, *supra*, 168 Cal.App.4th at pp. 27-28.)  In view of the totality of the circumstances test as stated and applied in *Stier*, this list is merely illustrative of salient facts that have justified the use of handcuffs in other cases.

10

Under the circumstances as expressly and impliedly found by the trial court, we conclude that handcuffing was reasonably necessary because the officers had an objectively reasonable basis to be concerned for their safety. (See *Celis*, *supra*, 33 Cal.4th at pp. 675-676; *Turner*, *supra*, 219 Cal.App.4th at p. 163; *Osborne*, *supra*, 175 Cal.App.4th at p. 1062.) As a result, Officer Maldonado lawfully observed the digital scale in defendant's pocket, which was exposed in plain view. At that point, the officer had probable cause to believe that defendant had engaged (or had attempted to engage) in a drug transaction and legally seized the scale, the pipe, and the methamphetamine incident to a lawful arrest.[6]

## DISPOSITION

The judgment is affirmed.


BLUMENFELD, J.[*]


We concur:



PERLUSS, P. J.                    SEGAL, J.

---

[6] While defendant urges us not to consider the digital scale in the probable cause analysis, he does not dispute the existence of probable cause if we were to take it into account. Because we conclude that Officer Maldonado lawfully observed the scale, we do find probable cause under the totality of the circumstances. (See *People v. Guajardo* (1994) 23 Cal.App.4th 1738, 1742-1743 [stating and applying factors in determining probable cause to arrest for drug transaction].) The subsequent search and seizure were thus justified, as they were incident to the arrest. (See *Rawlings v. Kentucky*, *supra*, 448 U.S. at p. 111 [holding that search may precede a formal arrest made "on the heels of the challenged search"]; accord, *In re Lennies H.*, *supra*, 126 Cal.App.4th at p. 1239 [same].)

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.